[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 02-16708 & 02-16949

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 1, 2003
THOMAS K. KAHN
CLERK

D. C. Docket Nos. 01-01268-CV-T-N
01-01269-CV-T-N

STEPHEN R. GLASSROTH,
BEVERLY J. HOWARD,

Plaintiffs-Appellees,

versus

ROY S. MOORE,
Chief Justice of the Alabama Supreme Court,

Defendant-Appellant.

-------------------------------------------------------

MELINDA MADDOX,

Plaintiff-Appellee,

versus

ROY S. MOORE, in his official capacity
as Administrative Head of the Alabama
Judicial System,

Defendant-Appellant.

Appeals from the United States District Court
for the Middle District of Alabama
_____
**(July 1, 2003)**

Before EDMONDSON, Chief Judge, CARNES, Circuit Judge, and STORY*, District Judge.

CARNES, Circuit Judge:

The Chief Justice of the Alabama Supreme Court installed a two-and-one-half ton monument to the Ten Commandments as the centerpiece of the rotunda in the Alabama State Judicial Building. He did so in order to remind all Alabama citizens of, among other things, his belief in the sovereignty of the Judeo-Christian God over both the state and the church. And he rejected a request to permit a monument displaying a historically significant speech in the same space on the grounds that "[t]he placement of a speech of any man alongside the revealed law of God would tend in consequence to diminish the very purpose of the Ten Commandments monument." Glassroth v. Moore, 229 F. Supp. 2d 1290, 1297 (M.D. Ala. 2002).

_____
*Honorable Richard W. Story, United States District Judge for the Northern District of Georgia, sitting by designation.

The monument and its placement in the rotunda create the impression of being in the presence of something holy and sacred, causing some building employees and visitors to consider the monument an appropriate and inviting place for prayer. Three attorneys who do not consider the monument appropriate at all and who do not share the Chief Justice's religious beliefs brought two separate lawsuits to have the monument taken out. Agreeing with them that it violated the Establishment Clause of the First Amendment, the district court ordered the monument removed. Glassroth, 229 F. Supp. 2d at 1319; 242 F. Supp. 2d 1067 (M.D. Ala. 2002). The Chief Justice appealed. We affirm.

## I.

Because "[i]n religious-symbols cases, context is the touchstone," King v. Richmond County, No. 02-14146, slip op. 2541, at 2552 (11th Cir. May 30, 2003), we set out the relevant facts in some detail, most of which are pulled from the district court's opinion, but a few of which we have drawn from undisputed testimony or other evidence in the record.

Chief Justice Moore began his judicial career as a judge on the Circuit Court of Etowah County, Alabama. After taking office he hung a hand-carved, wooden plaque depicting the Ten Commandments behind the bench in his courtroom and routinely invited clergy to lead prayer at jury organizing sessions. Those actions

3

generated two high-profile lawsuits in 1995 based on the Establishment Clause, one filed by a nonprofit organization seeking an injunction and the other brought by the State of Alabama seeking a declaratory judgment that then-Judge Moore's actions were not unconstitutional. Both suits were dismissed on justiciability grounds. Ala. Freethought Ass'n v. Moore, 893 F. Supp. 1522 (N.D. Ala. 1995); Alabama ex rel. James v. ACLU, 711 So. 2d 952 (Ala. 1998); see Glassroth, 229 F. Supp. 2d at 1293-94.

During his campaign for the Chief Justice position in the November 2000 election, then-Judge Moore's campaign committee, capitalizing on name recognition from the lawsuits, decided to refer to him as the "Ten Commandments Judge." Although the Chief Justice says he never described himself that way, he did not disagree with his campaign committee's decision. As a result, most of his campaign materials, including billboards, television and radio commercials, telephone scripts, and mailings, described him as the "Ten Commandments Judge" or otherwise referred to the Ten Commandments. The central platform of his campaign was a promise "to restore the moral foundation of law." Glassroth, 229 F. Supp. 2d at 1294.

After he was elected, Chief Justice Moore fulfilled his campaign promise by installing the Ten Commandments monument in the rotunda of the Alabama State

4

Judicial Building. Id. at 1294, 1303. That building houses the Alabama Supreme Court, the Court of Criminal Appeals, the Court of Civil Appeals, the state law library, and the state's Administrative Office of the Courts. The Chief Justice, as administrative head of the Alabama judicial system and as lessee of the Judicial Building, has final authority over the decoration of the rotunda and whether to put any displays in the building. See Ala. Const. Amend. 328, § 6.10; Ala. Code § 41-10-275. Chief Justice Moore placed the monument in the rotunda of the Judicial Building without the advance approval or even knowledge of any one of the other eight justices of the Alabama Supreme Court. All decisions regarding it were made by him. Glassroth, 229 F. Supp. 2d at 1294. He did not use any government funds in creating or installing the monument. Id.

Thousands of people enter the Judicial Building each year. In addition to attorneys, parties, judges, and employees, every fourth grader in the state is brought on a tour of the building as part of a field trip to the state capital. No one who enters the building through the main entrance can miss the monument. It is in the rotunda, directly across from the main entrance, in front of a plate-glass window with a courtyard and waterfall behind it. After entering the building, members of the public must pass through the rotunda to access the public elevator or stairs, to enter the law library, or to use the public restrooms. A person walking

5

to the elevator, stairs, or restroom will pass within ten to twenty feet of the monument.  The Chief Justice chose the location of the monument so that everyone visiting the Judicial Building would see it.  Id.

The 5280-pound granite monument is "approximately three feet wide by three feet deep by four feet tall."  Id.  Two tablets with rounded tops are carved into the sloping top of the monument.  Excerpts from Exodus 20:2-17 of the King James Version of the Holy Bible, the Ten Commandments, are chiseled into the tablets.  The left one reads:

I AM THE LORD THY GOD

THOU SHALT HAVE NO OTHER GODS BEFORE ME

THOU SHALT NOT MAKE UNTO THEE ANY GRAVEN IMAGE

THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN

REMEMBER THE SABBATH DAY, TO KEEP IT HOLY

The right one reads:

HONOUR THY FATHER AND THY MOTHER

THOU SHALT NOT KILL

THOU SHALT NOT COMMIT ADULTERY

THOU SHALT NOT STEAL

THOU SHALT NOT BEAR FALSE WITNESS

THOU SHALT NOT COVET[1]

Glassroth, 229 F. Supp. 2d at 1294-95; id. at 1320 (App. A - photograph of the monument).

Below the Ten Commandments, each side of the monument contains one large-sized and several smaller-sized quotations. The quotations are excerpted from various historical documents and authorities. They are described and set out in full in the district court's opinion. Id. at 1295; id. at 1320-21 (App. B - providing full quotations of the monument's text). The quotations from secular sources were placed below the Ten Commandments because of Chief Justice Moore's belief that the words of mere men could not be placed on the same plane as the Word of God. Id. at 1295.

"Due to the slope of the monument's top and the religious appearance of the tablets, the tablets call to mind an open Bible resting on a lectern." Id. The

---

[1] Observant readers will notice that the tablets contain a total of eleven statements. Different faiths dispute how the sixteen verses in Exodus 20:2-17 should be divided to reflect the later references to "Ten Commandments." Exodus 34:28; Deuteronomy 4:13, 10:4. As one expert testified at trial, "[e]ach tradition has struggled with how they should be numbered." For example, many Jews and some Christians consider the "First Commandment" to be "I am the Lord thy God," while others consider the First Commandment to be "Thou shalt [or You shall] have no other gods before me." More about the significance of this kind of disagreement for Establishment Clause purposes is found in note 3, below.

In any event, the division of the commandments between two tablets is significant. As the Chief Justice (who called them "tables") explained: "the first table represents the duties which we owe to GOD," and "[t]he second table represents the duties which we owe to each other." 1st Supp. Rec. Vol. 2 at 150.

appearance and location of the monument itself give one "the sense of being in the presence of something not just valued and revered (such as an historical document) but also holy and sacred." Id. Employees and visitors to the building consider it an appropriate and inviting place for prayer. Id.

The monument was installed after the close of business during the evening of July 31, 2001. The Chief Justice has explained that it was done at night to avoid interrupting the normal business of the building. The installation of the monument that night was filmed by Coral Ridge Ministries, an evangelical Christian media outreach organization. Id. at 1294. The organization has used its exclusive footage of the installation to raise funds for its own purpose and for Chief Justice Moore's legal defense, which it has underwritten. Id. at 1304 n.2.

At the public unveiling of the monument the day after its installation, Chief Justice Moore delivered a speech commemorating the event, and in that speech he talked about why he had placed the monument, which he described as one "depicting the moral foundation of our law," where he did. He explained that the location of the monument was "fitting and proper" because:

> this monument will serve to remind the appellate courts and judges of the circuit and district courts of this state, the members of the bar who appear before them, as well as the people who visit the Alabama Judicial Building, of the truth stated in the preamble of the Alabama

Constitution, that in order to establish justice, we must invoke "the favor and guidance of Almighty God."[2]

Id. at 1321-24 (App. C - reproducing the full text of Chief Justice Moore's remarks at the unveiling ceremony). During that speech, the Chief Justice criticized government officials who "forbid teaching your children that they are created in the image of Almighty God" and who "purport all the while that it is a government and not God who gave us our rights," because they have "turned away from those absolute standards which form the basis of our morality and the moral foundation of our law" and "divorced the Constitution and the Bill of Rights from these principles." Id. at 1322. Recalling his campaign "pledge to restore the moral foundation of law," he noted that "[i]t is axiomatic that to restore morality, we must first recognize the source of that morality," and that "our forefathers recognized the sovereignty of God." Id. He noted during the speech that no government funds had been expended on the monument.

The Chief Justice described various acknowledgments of God throughout this country's history, some of which, he pointed out, are inscribed on the monument. He proclaimed that the unveiling of the monument that day "mark[ed]

_____

[2] See Ala. Const. Pmbl. ("We, the people of the State of Alabama, in order to establish justice, insure domestic tranquillity, and secure the blessings of liberty to ourselves and our posterity, invoking the favor and guidance of Almighty God, do ordain and establish the following Constitution and form of government for the State of Alabama.").

the restoration of the moral foundation of law to our people and the return to the knowledge of God in our land." Id. at 1321. In closing, he told the audience that they would "find no documents surrounding the Ten Commandments because they stand alone as an acknowledgment of that God that's contained in our pledge, contained in our motto, and contained in our oath." Id. at 1324.

During the trial the Chief Justice testified candidly about why he had placed the monument in the rotunda. The following exchanges between him and one of the plaintiffs' attorneys establish that purpose:

> Q [W]as your purpose in putting the Ten Commandments monument in the Supreme Court rotunda to acknowledge GOD's law and GOD's sovereignty? . . .
>
> A Yes.

1st Supp. Rec. Vol. 2 at 100.

> Q . . . Do you agree that the monument, the Ten Commandments monument, reflects the sovereignty of GOD over the affairs of men?
>
> A Yes.
>
> Q And the monument is also intended to acknowledge GOD's overruling power over the affairs of men, would that be correct? . . .
>
> A Yes.
>
> Q . . . [W]hen you say "GOD" you mean GOD of the Holy Scripture?

10

A     Yes.

1st Supp. Rec. Vol. 3 at 34.

The rotunda is open to the public, but it is not a public forum where citizens can place their own displays. Glassroth, 229 F. Supp. 2d at 1303. Chief Justice Moore has denied the two requests that have been made to place other displays in the rotunda. He did so because he believed that those displays would have been inconsistent with the rotunda's theme of the moral foundation of law. An Alabama State Representative asked the Chief Justice if a monument containing the Rev. Dr. Martin Luther King Jr.'s famous "I Have a Dream" speech could be placed in the rotunda. The Chief Justice denied the request in a letter, stating that, "The placement of a speech of any man alongside the revealed law of God would tend in consequence to diminish the very purpose of the Ten Commandments monument." Id. at 1297. He also denied an atheist group's request to display a symbol of atheism in the rotunda. Id.

The Chief Justice did add two smaller displays to the rotunda at some point after the Ten Commandments monument was installed. The first, a plaque entitled "Moral Foundation of Law," contains a quotation from the Rev. Dr. Martin Luther King Jr.'s letter from the Birmingham jail speaking of just laws and "the moral law or law of God," and a quotation from Frederick Douglass speaking of slavery as

11

hiding man "from the laws of God." Id. at 1324-25 (App. D - providing a full quotation of the plaque). That plaque, which the Chief Justice paid for with his own money, measures forty-two inches by thirty-two inches. Id. at 1296. The second display is a brass plaque that contains the Bill of Rights. That plaque, measuring thirty inches by thirty-six inches, had been found in a box in the building. The Chief Justice added both plaques because he thought that they "comported with the 'moral foundation of law theme.'" Id. The two plaques are inconspicuous compared to the Ten Commandments monument. Each is not only much smaller than the monument, but also is located seventy-five feet from it. A person standing in front of the monument cannot see either plaque. Nothing about their location or appearance indicates that they are connected to the monument. Id.

The three plaintiffs are practicing attorneys in the Alabama courts. As a result of their professional obligations, each of them has entered, and will in the future have to enter, the Judicial Building. Because of its location, they necessarily come in contact with the monument. The monument offends each of them and makes them feel like "outsiders." Because of the monument, two of the plaintiffs have chosen to visit the Judicial Building less often and enjoy the rotunda less when they are there. One of those two has avoided the building to the extent of purchasing law books and online research services instead of using the library, and

12

hiring a messenger to file documents in the courts located in the Judicial Building. Id. at 1297.

## II.

Pursuant to 42 U.S.C. § 1983, the three plaintiffs sued Chief Justice Moore in his official capacity as administrative head of Alabama's judicial system, claiming that his actions violated the Establishment Clause of the First Amendment as applied to the states through the Due Process Clause of the Fourteenth Amendment. They sought a declaratory judgment that his actions were unconstitutional and an injunction to force him to remove the monument. Prior to trial, Chief Justice Moore's counsel requested – it may have been done jointly, but it is unclear from the record whether the plaintiffs actually joined or simply did not object to the request – that the district court judge visit the monument. The judge did so, accompanied by the attorneys for both sides. Id. at 1295.

After a seven-day bench trial, the district court concluded that Chief Justice Moore's actions violated the Establishment Clause because his purpose in displaying the monument was non-secular and because the monument's primary effect is to advance religion. Id. at 1299, 1304. The court entered judgment to that effect and gave the Chief Justice thirty days to remove the monument voluntarily. After he declined to do so, the district court entered an order enjoining him from

failing to remove the monument from the public areas of the Judicial Building. Glassroth v. Moore, 242 F. Supp. 2d 1067 (M.D. Ala. 2002). The Chief Justice appealed, and the district court stayed its injunction pending appeal. Glassroth v. Moore, 242 F. Supp. 2d 1068 (M.D. Ala. 2002).

## III.

As this Court recently explained, Establishment Clause challenges are not decided by bright-line rules, but on a case-by-case basis with the result turning on the specific facts. King v. Richmond County, No. 02-14146, slip op. 2541 (11th Cir. May 30, 2003). As we have already noted, the facts set out in this opinion are taken largely from the district court's findings. The Chief Justice attacks those findings on several bases.

### A.

First, he contends that the district court judge should not have made any factfindings based upon his viewing of the monument and its surrounds. The judge unquestionably made important factfindings as a result of what he saw when he viewed the monument and the rotunda in which it is located. That was error, the Chief Justice argues, because he had thought that the only purpose of the district court's view of the monument and the area around it was to provide the court with a physical context within which to assess the evidence admitted in the courtroom.

14

The sole decision cited by the Chief Justice in connection with the viewing issue is <u>Lillie v. United States</u>, 953 F.2d 1188 (10th Cir. 1992), which involved a judge's uninvited viewing of the scene of the accident, outside the presence of counsel and without their knowledge. The Tenth Circuit concluded that was error because, "[w]ithout presence of counsel there is no way to be certain that the premises viewed are in the same condition as when the event occurred, or that the court does not view the wrong premises or objects." <u>Id.</u> at 1191. That is not a problem in this case, because the district court judge undertook the view only after fully discussing the matter with counsel for both sides and scheduling the time of the viewing with counsel in advance. And he undertook the view in their presence. There was no procedural irregularity or lack of notice.

The district court told the attorneys early in the status conference that if the case was decided on summary judgment motions, the court would not be making any findings of fact from its view. That is, of course, correct. Courts do not find facts when deciding summary judgment motions, but this case was not decided on summary judgment. As we will point out shortly, counsel for both sides fully expected that the district court judge would be considering the facts and circumstances he observed during the view if the case was decided by trial, as it was, instead of on summary judgment.

15

To the extent the Chief Justice is arguing that factfinders should never find facts from what they observe at a view but should only use what they see to put into context the facts they hear in the courtroom, we agree with the Tenth Circuit that "such a distinction is only semantic, because any kind of presentation to the jury or the judge to help the fact finder determine what the truth is and assimilate and understand the evidence is itself evidence." Id. at 1190; accord Snyder v. Massachusetts, 291 U.S. 97, 121, 54 S. Ct. 330, 338 (1934) (the "inevitable effect [of a view] is that of evidence, no matter what label the judge may choose to give it"), overruled on other grounds by Duncan v. Louisiana, 391 U.S. 145, 88 S. Ct. 1444 (1968), Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489 (1964); In re Application to Take Testimony, 102 F.R.D. 521, 524 (E.D.N.Y. 1984) ("Authorities now generally agree that the view provides independent evidence."); Foster v. State, 12 So. 822, 823 (Miss. 1893) ("To say the jury cannot receive evidence by simply viewing the scene is to insult common sense. The most convincing evidence is made by the sense of sight. The juror, on the view, sees, and thinks he knows what he sees, with all the conclusions flowing therefrom."); 6 John Henry Wigmore, Wigmore on Evidence § 1803 (James H. Chadbourn rev. 1976) (the jury on a view is receiving evidence because "to view the thing itself in issue – i.e., the premises – is undoubtedly to consult a source of proof"); 2 Jack B.

16

Weinstein, Weinstein's Federal Evidence (2d ed.) § 403.07[4] (2d ed. 2003) ("[T]he modern position is that the view does provide independent evidence."). Just as pictures of the monument and the rotunda that were submitted as exhibits are evidence, so too is what the judge saw when he viewed the actual monument and its setting.

In any event, "[i]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." United States v. Ross, 131 F.3d 970, 988 (11th Cir. 1997) (quoting Crockett v. Uniroyal, Inc., 772 F.2d 1524, 1530 n.4 (11th Cir. 1985)). Counsel for Chief Justice Moore urged the district court judge to undertake a view. When the judge said at a status conference that if summary judgment was granted the issue of looking at the monument would be moot, counsel for the Chief Justice disagreed, protesting that: "I believe it's almost incumbent upon the Court to walk into the Judicial Building," and "I still think it's almost necessary to take a look at this yourself because of the proximity and also because of just the manner in which the facts play out here." Rec. Vol. 12 at 15.

The district court judge asked if the lawyers were going to make arrangements for him to see the monument and point out what he was to see. Counsel for the plaintiffs answered, without objection, that both sides had agreed:

17

"you just walk in the front door and everything in the rotunda is fair game. And we believe that the lawyers shouldn't speak unless you've got a question for us. And the lawyers would be there, none of their clients would be there, and that would be it." Rec. Vol. 12 at 17.

Counsel for the Chief Justice agreed with that statement about how the view should be conducted, and he made clear that the whole point was for the district court judge to be able to gather facts about the monument and its setting, saying:

> But I think with either the summary judgment motion or response, and/or the pretrial briefs, that there's going to be a lot of facts in there that will probably give each side's impression of how they interpret the inside of the rotunda. But I agree with [plaintiffs' counsel] that you're a jury. You have to walk in and see what you see and then [sic] just like a juror would.

Rec. Vol. 12 at 16-17.

During argument about the cross-motions for summary judgment, and before the view took place, counsel for the Chief Justice contended that summary judgment was improper because the district court needed to view the monument as part of the necessary "inquiry into the facts and circumstances":

> [T]he issue with regard to how a reasonable person would view the monument would require an examination of what you might call social facts, which would require at least an examination of the monument itself. This is why we believe it's important for you to go into the rotunda and view that monument and view the setting itself. Unless you see it yourself, and since the reasonable person test is a test that's supposed to be applied by the judge, it would be difficult

18

for the judge to apply that particular test unless there was an inquiry into the facts and circumstances with regard to this matter.

Rec. Vol. 13 at 43-44. So eager was he to have the district court judge conduct the view "just like a juror would," that counsel for the Chief Justice volunteered his help in arranging parking for the district court judge at the Judicial Building. Any conceivable error was not just invited error, but invited error with a parking space.

B.

The Chief Justice also complains that the district court did not state its findings from the view into the record so that the parties would have had an opportunity to challenge them before the court issued its opinion. He never asked the court to do that, and factfinders traditionally do not state facts into the record before deciding the case; juries never do. The parties were on notice that the court might make factfindings from what it saw during the view, and if either side had wanted those findings stated into the record before a decision was made, it should have requested that extraordinary procedure. Since neither side asked for that procedure, we need not decide whether it would have been necessary or appropriate if requested.

C.

In a related challenge to the district court's findings, the Chief Justice argues that the district court judge should not have relied upon his subjective impressions

19

from viewing the monument and its surrounding space. Recall that this same party's counsel had urged the district court judge to undertake a view in order to find the "social facts" about how a reasonable person would see the monument and its surroundings. When the district court described how the monument and its presentation in the rotunda gave one a "sense of being in the presence of something not just valued and revered (such as an historical document) but also holy and sacred," Glassroth, 229 F. Supp. 2d at 1295, the court was articulating findings about the impression the monument made on the viewer, and would make on a reasonable person viewing it. It was required to do that in order to apply the reasonable person test.

D.

Apart from the factfinding issues arising from the view, Chief Justice Moore also argues that the district court made factfindings not supported by the record. We review district court factfindings only for clear error, and as we have explained, "[w]e cannot hold a district court's finding of fact clearly erroneous unless, in view of the entire record, we are 'left with a definite and firm conviction that a mistake has been committed.'" Eng'g Contractors Ass'n v. Metropolitan Dade County, 122 F.3d 895, 904 (11th Cir. 1997) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985)). We cannot

20

reach the requisite definite and firm conviction that a mistake in factfinding has been made, the Supreme Court has told us, where the district court has chosen one of two plausible views of the evidence. Anderson, 470 U.S. at 574, 105 S. Ct. at 1511 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citations omitted).

The specific factfinding relating to the merits of the constitutional issue that the Chief Justice challenges is the district court's finding that "visitors and building employees consider the monument an appropriate, and even compelling, place for prayer." Glassroth, 299 F. Supp. 2d at 1295. That is at least a plausible view of the evidence in light of the testimony of one of the plaintiffs that she had witnessed a group in prayer around the monument, and the testimony of a building employee that on several occasions he had prayed in front of the monument by himself and with other employees, silently and out loud.

**IV.**

We turn now to the legal issues. The threshold one is whether these plaintiffs have standing to bring the lawsuits that led to these appeals. The Chief Justice disputes the district court's conclusion that they do, a conclusion we review de novo. Ga. State Conf. of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999).

The applicable principles are well-settled:

> To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.

Bennett v. Spear, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997) (citations omitted). For Establishment Clause claims based on non-economic harm, the plaintiffs must identify a "personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." Valley Forge Christian Coll. v. Ams. United for Sep. of Church & State, Inc., 454 U.S. 464, 485, 102 S. Ct. 752, 765 (1982). In this type of case, plaintiffs have standing if they are "'directly affected by the laws and practices against [which] their complaints are directed,'" Saladin v. City of Milledgeville, 812 F.2d 687, 692 (11th Cir. 1987) (quoting Sch. Dist. of Abington Township v. Schempp, 374 U.S. 203, 224 n.9, 83

22

S. Ct. 1560, 1572 n.9 (1963)), such as where the plaintiffs are "'forced to assume special burdens' to avoid 'unwelcome religious exercises,'" ACLU v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098, 1107 (11th Cir. 1983) (per curiam) (quoting Valley Forge, 454 U.S. at 487 n.22, 102 S. Ct. at 766 n.22).

The location of the monument in the rotunda of the Judicial Building makes it impossible for anyone using the stairs, elevators, or restrooms to avoid it. Everyone going to the state law library in the building has to walk past the monument. Glassroth, 229 F. Supp. 2d at 1294. The three plaintiffs are attorneys whose professional duties require them to enter the Judicial Building regularly, and when they do so they must pass by the monument. None of them shares the Chief Justice's religious views, and all of them consider the monument offensive. It makes them feel like outsiders, and two of the plaintiffs have altered their behavior as a consequence. Id. at 1297. As we noted earlier, one of those two has incurred expenses in order to minimize contact with the monument, purchasing law books and online research to minimize use of the state law library and hiring messengers to file documents in the courts located in the building.

Under these facts, the two plaintiffs who have altered their behavior as a result of the monument have suffered and will continue to suffer injuries in fact sufficient for standing purposes. See Schempp, 374 U.S. at 224 n.9, 83 S. Ct. at

23

1572 n.9 (holding that school children and parents had standing to challenge a state law requiring the Bible to be read every morning in public schools); Saladin, 812 F.2d at 692-93 (holding that city residents had standing to challenge the city's placement of the word "Christianity" on its official seal because they regularly received correspondence bearing the seal and the seal made them feel like "second class citizens"); Rabun County, 698 F.2d at 1107-08 (holding that state residents who used public parks had standing to challenge the placement of a lighted Latin cross in a public park where they were unwilling to camp in that park because of the "physical and metaphysical impact of the cross"). Further, a favorable decision will likely redress their injuries. If Chief Justice Moore is required to remove the monument from the public area of the Judicial Building, the plaintiffs will no longer have to observe it or take actions to avoid going into the building.

Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff, the one who has not altered his behavior as a result of the monument, has standing. Rabun County, 698 F.2d at 1108-09 ("Because we have determined that at least these two individuals have met the requirements of Article III, it is unnecessary for us to consider the standing of the other plaintiffs in this action."); accord Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S. Ct. 205, 212 (1981).

Contrary to Chief Justice Moore's contention, the injuries the plaintiffs assert are not based solely on their disagreement with his views about religion and government, which would be a non-redressable injury. While the Chief Justice's views may aggravate the emotional injury the plaintiffs suffer from viewing the monument, the worst of the wound is inflicted by the monument itself. The plaintiff who has incurred expense and inconvenience to avoid entering the building has done so not because it houses the Chief Justice's chambers, but because the monument is there. The district court did not err by declining to dismiss the cases on standing grounds. Now to the merits of the constitutional issue.

**V.**

Because of this country's "history and tradition of religious diversity that dates from the settlement of the North American Continent," the Founders included in the Bill of Rights an Establishment Clause which prohibits any law "respecting an establishment of religion." County of Allegheny v. ACLU, 492 U.S. 573, 589, 109 S. Ct. 3086, 3099 (1989). In the more than two centuries since that clause became part of our Constitution, the Supreme Court has arrived at an understanding of its general meaning, which is that "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate

25

among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." Id. at 590-91, 109 S. Ct. at 3099 (footnotes omitted). Some aspects of the Chief Justice's position in this case are aimed directly at that understanding. Take, for example, the one we address next.

A.

The First Amendment does not say that no government official may take any action respecting an establishment of religion or prohibiting the free exercise thereof. It says that "Congress shall make no law" doing that. Chief Justice Moore is not Congress. Nonetheless, he apparently recognizes that the religion clauses of the First Amendment apply to all laws, not just those enacted by Congress. See Everson v. Bd. of Educ., 330 U.S. 1, 15, 67 S. Ct. 504, 511 (1947) (holding that the Establishment Clause applies to the states through the Due Process Clause of the Fourteenth Amendment). Even with that concession, his position is still plenty bold. He argues that because of its "no law" language, the First Amendment proscribes only laws, which should be defined as "a rule of civil conduct . . . commanding what is right and prohibiting what is wrong." Brief of Appellant at 19 (quoting 1 William Blackstone, Commentaries *44). Any governmental action promoting religion in general or a particular religion is free from constitutional

26

scrutiny, he insists, so long as it does not command or prohibit conduct. The monument does neither, but instead is what he calls "a decorative reminder of the moral foundation of American law." Brief of Appellant at 19.

The breadth of the Chief Justice's position is illustrated by his counsel's concession at oral argument that if we adopted his position, the Chief Justice would be free to adorn the walls of the Alabama Supreme Court's courtroom with sectarian religious murals and have decidedly religious quotations painted above the bench. Every government building could be topped with a cross, or a menorah, or a statue of Buddha, depending upon the views of the officials with authority over the premises. A crèche could occupy the place of honor in the lobby or rotunda of every municipal, county, state, and federal building. Proselytizing religious messages could be played over the public address system in every government building at the whim of the official in charge of the premises.

However appealing those prospects may be to some, the position Chief Justice Moore takes is foreclosed by Supreme Court precedent. County of Allegheny, 492 U.S. at 612, 109 S. Ct. at 3110, which held unconstitutional the placement of a crèche in the lobby of a courthouse, stands foursquare against the notion that the Establishment Clause permits government to promote religion so long as it does not command or prohibit conduct. Id., 109 S. Ct. at 3110 ("To be

27

sure, some Christians may wish to see the government proclaim its allegiance to Christianity in a religious celebration of Christmas, but the Constitution does not permit the gratification of that desire, which would contradict 'the logic of secular liberty' it is the purpose of the Establishment Clause to protect.") (citation omitted). To the same effect is the decision in Lee v. Weisman, 505 U.S. 577, 587, 112 S. Ct. 2649, 2655 (1992), where the Supreme Court explained that, "[a] school official, the principal, decided that an invocation and a benediction should be given; this is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur." And in Jaffree v. Wallace, 705 F.2d 1526 (11th Cir. 1983), prob. juris. noted and aff'd in part, 466 U.S. 924, 104 S. Ct. 1704, cert. denied sub. nom. Bd. of Sch. Comm'rs of Mobile County v. Jaffree, 466 U.S. 926, 104 S. Ct. 1707, and aff'd in part, 472 U.S. 38, 105 S. Ct. 2479 (1985), this Court concluded that "[i]f a statute authorizing the teachers' activities would be unconstitutional, then the activities, in the absence of a statute, are also unconstitutional." Id. at 1533-35.

B.

Another of the Chief Justice's broad-based attacks on the application of the Establishment Clause to his conduct involves the definition of religion. He insists that for First Amendment purposes religion is "the duty which we owe to our

28

Creator, and the manner of discharging it"; nothing more, nothing less. Brief of Appellant at 11-12 (quoting Virginia Declaration of Rights Art. I, § 16 (1776)). The Chief Justice argues that the Ten Commandments, as he has presented them in the monument, do not involve the duties individuals owe the Creator, and therefore they are not religious; instead, he says, they represent the moral foundation of secular duties that individuals owe to society.

The Supreme Court has instructed us that for First Amendment purposes religion includes non-Christian faiths and those that do not profess belief in the Judeo-Christian God; indeed, it includes the lack of any faith. Allegheny County, 492 U.S. at 590, 109 S. Ct. at 3099 ("Perhaps in the early days of the Republic these words [of the Establishment Clause] were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.") (internal marks omitted); Wallace v. Jaffree, 472 U.S. 38, 52-53, 105 S. Ct. 2479, 2487-88 (1985) ("[T]he Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all.") (footnote omitted); Torcaso v. Watkins, 367 U.S. 488, 495, 81 S. Ct. 1680, 1683-84 (1961). Chief Justice Moore's proffered definition of religion is

29

inconsistent with the Supreme Court's because his presupposes a belief in God. We understand that the Chief Justice disagrees with the Supreme Court's definition of religion, but we are bound by it.

As for the other essential premise of Chief Justice Moore's argument – that the Ten Commandments monument depicts only the moral foundation of secular duties – the Supreme Court has instructed us that "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." Stone v. Graham, 449 U.S. 39, 41, 101 S. Ct. 192, 194 (1980) (footnote omitted). The Stone decision did not hold that all government uses of the Ten Commandments are impermissible; they may be used, for example, in a secular study of history, civilization, or comparative religion. Id. at 42, 101 S. Ct. at 194. Use of the Ten Commandments for a secular purpose, however, does not change their inherently religious nature, and a particular governmental use of them is permissible under the Establishment Clause only if it withstands scrutiny under the prevailing legal test. As we discuss next, the use to which Chief Justice Moore, acting as a government official, has put the Ten Commandments in this case fails that test.

C.

30

For a practice to survive an Establishment Clause inquiry, it must pass the three-step test laid out in Lemon v. Kurtzman, 403 U.S. 602, 91 S. Ct. 2105 (1971). The Lemon test requires that the challenged practice have a valid secular purpose, not have the effect of advancing or inhibiting religion, and not foster excessive government entanglement with religion. Id. at 612-13, 91 S. Ct. at 2111.

We follow the tradition in this area by beginning with the almost obligatory observation that the Lemon test is often maligned. See, e.g., Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 398, 113 S. Ct. 2141, 2150 (1993) (Scalia, J., concurring) ("[N]o fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the [Lemon test's] heart (the author of today's opinion repeatedly), and a sixth has joined an opinion doing so."); Wallace v. Jaffree, 472 U.S. at 110, 105 S. Ct. at 2517 (Rehnquist, J., dissenting) ("The three-part test has simply not provided adequate standards for deciding Establishment Clause cases, as this Court has slowly come to realize."); Elenore Cotter Klingler, Case Comment, Constitutional Law: Endorsing a New Test for Establishment Clause Cases, 53 Fla. L. Rev. 995 (2001). But it is even more often applied.

What the Supreme Court said ten years ago remains true today: "Lemon, however frightening it might be to some, has not been overruled." Lamb's Chapel,

31

508 U.S. at 395 n.7, 113 S. Ct. at 2148 n.7. We applied the Lemon test in another religious display case just days before this one was orally argued. See King v. Richmond County, No. 02-14146, slip op. 2541 (11th Cir. May 30, 2003). In doing so, we observed that "[e]ven though some Justices and commentators have strongly criticized Lemon, both the Supreme Court and this circuit continue to use Lemon's three-pronged analysis." Id. at 2545-46 (footnote omitted). Having noted that again today, we proceed with the test.

Applying Lemon, the district court concluded that Chief Justice Moore's purpose in displaying the monument was not secular. It based that conclusion on the Chief Justice's own words, on the monument itself, and on the physical context in which it appears. Glassroth, 229 F. Supp. 2d at 1299-1300. The court found the case not as difficult as those in which the Ten Commandments display had "an arguably secular, historical purpose, for the evidence here does not even begin to support that conclusion, nor does the evidence support the conclusion that the Ten Commandments were displayed as sort of a secular moral code." Id. at 1301. Instead, "[t]he Chief Justice's words unequivocally belie such purposes." Id.

Citing Justice O'Connor's concurring opinion in Wallace v. Jaffree, 472 U.S. at 74, 105 S. Ct. at 2499 (O'Connor, J., concurring), Chief Justice Moore argues that the district court erred by psychoanalyzing him and, as he puts it,

32

"dissecting [his] heart and mind." Brief of Appellant at 42. Wallace v. Jaffree involved legislative purpose, not that of an individual governmental actor. 472 U.S. at 40, 105 S. Ct. at 2481. Besides, no psychoanalysis or dissection is required here, where there is abundant evidence, including his own words, of the Chief Justice's purpose.

Chief Justice Moore testified candidly that his purpose in placing the monument in the Judicial Building was to acknowledge the law and sovereignty of the God of the Holy Scriptures, and that it was intended to acknowledge "God's overruling power over the affairs of men." 1st Supp. Rec. Vol. 2 at 100; 1st Supp. Rec. Vol. 3 at 34. In his unveiling speech, the Chief Justice described his purpose as being to remind all who enter the building that "we must invoke the favor and guidance of Almighty God." Glassroth, 229 F. Supp. 2d at 1297, 1322 (App. C). And he said that the monument marked "the return to the knowledge of God in our land." Id. at 1323. He refused a request to give a famous speech equal position and prominence because, he said, placing "a speech of any man alongside the revealed law of God would tend to diminish the very purpose of the Ten Commandments monument." Id. at 1297.

Against the weight of all this evidence, Chief Justice Moore's insistence in his briefs and argument, and in part of his testimony, that the Ten Commandments

as presented in his monument have a purely secular application is unconvincing. That argument is akin to the state's contention in Stone that the fine print about secular purpose on the Ten Commandments posters in that case gave them a constitutionally permissible purpose. 449 U.S. at 41, 101 S. Ct. at 193. At the bottom of each poster was a statement that: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the common law of the United States." Id., 101 S. Ct. at 193. The Supreme Court said, "[u]nder this Court's rulings, however, such an 'avowed' secular purpose is not sufficient to avoid conflict with the First Amendment." Id., 101 S. Ct. at 193-94. The same is true here.

Under our circuit law, the purpose inquiry is a factual one, see ACLU v. Rabun County Chamber of Commerce, 698 F.2d 1098, 1110-11 (11th Cir. 1983), and on appeal we are obligated to accept the district court's findings of fact unless they are clearly erroneous, Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985). Clearly erroneous they are not. Moreover, even if we were free to review the determination de novo, having examined the record ourselves, we agree with the district court that it is "self-evident" that Chief Justice Moore's purpose in displaying the monument was non-secular. Given all of the

34

evidence, including the Chief Justice's own words, we cannot see how a court could reach any other conclusion.

Our inquiry could end there, because "[w]hen evidence shows that endorsement or promotion of religion was a primary purpose for the challenged practice . . . the practice violates the Establishment Clause." King, No. 02-14146, slip op. at 2548. But in the interest of completeness, we will also review the district court's additional holding that the monument had the primary effect of advancing religion.

"The effect prong asks whether . . . the practice under review in fact would convey a message of endorsement or disapproval to an informed, reasonable observer." Id. at 2549. The district court concluded that a reasonable observer would view the monument's primary effect as an endorsement of religion. Glassroth, 229 F. Supp. 2d at 1302-03. It based that conclusion on: the appearance of the monument itself; its location and setting in the rotunda; the selection and location of the quotations on its sides; and the inclusion on its face of the text of the Ten Commandments, which is an "undeniably . . . sacred text," Stone, 449 U.S. at 41, 101 S. Ct. at 194, all of which contributed to "the ineffable but still overwhelming holy aura of the monument," Glassroth, 229 F. Supp. 2d at 1303-04. The court also considered: the fact that the Chief Justice campaigned as

35

the "Ten Commandments Judge"; his statements at the monument's unveiling; and the fact that the rotunda is not a public forum for speech. Id. The court concluded that a reasonable observer "would find nothing on the monument to de-emphasize its religious nature, and would feel as though the State of Alabama is advancing or endorsing, favoring or preferring, Christianity." Id. at 1304.

The parties agree that our review of the district court's effect ruling is plenary. Having reviewed the matter de novo, and aided by the district court's meticulous findings of fact, we reach the same conclusion the district court did, which is to say that we also agree with the concession that Chief Justice Moore made in his testimony when he said that the monument "reflects the sovereignty of God over men." 1st Supp. Rec. Vol. 3 at 34. The monument fails two of Lemon's three prongs. It violates the Establishment Clause.

D.

Chief Justice Moore contends that even if it cannot clear the Lemon test, the monument is saved by the Supreme Court's decision in Marsh v. Chambers, 463 U.S. 783, 103 S. Ct. 3330 (1983). In that case, the Supreme Court considered a challenge to the Nebraska Legislature's practice of employing a chaplain to lead it in prayer at the beginning of each session. Id. at 784-85, 103 S. Ct. at 3332-33. Applying the Lemon test to the practice, the court of appeals concluded that the

36

practice of beginning legislative sessions with prayer violated all three requirements of the test. Id. at 786, 103 S. Ct. at 3333. The Supreme Court, without applying Lemon, reversed on the ground that the challenged practice was "deeply embedded in the history and tradition of this country." Id., 795, 103 S. Ct. at 3333, 3338.

The Court recounted the history of the practice, finding that "[f]rom colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." Id. at 786, 103 S. Ct. at 3333. The Court further noted that Congress authorized the appointment of paid chaplains just days before a final agreement on the language of the Bill of Rights was reached. Id. at 787-88, 103 S. Ct. at 3333-34. "Clearly the men who wrote the First Amendment Religion Clauses did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." Id. at 788, 103 S. Ct. at 3334 (footnote omitted). The Court concluded that "[i]n light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." Id. at 792, 103 S. Ct. at 3336.

37

Turning back to this case, there is no evidence of an "unambiguous and unbroken history" of displaying religious symbols in judicial buildings. Chief Justice Moore insists, though, that Marsh must be read much more broadly, that the issue turns on "whether the monument's acknowledgments of God as the source of law and liberty in America parallel similar acknowledgments of God at the time of America's founding." Brief of Appellant at 44. That there were some government acknowledgments of God at the time of this country's founding and indeed are some today, however, does not justify under the Establishment Clause a 5280-pound granite monument placed in the central place of honor in a state's judicial building. The Supreme Court has warned that a broad reading of Marsh "would gut the core of the Establishment Clause" and has stated that "Marsh plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today." Allegheny County, 492 U.S. at 603-04, 109 S. Ct. at 3106.

Chief Justice Moore has pointed to no evidence that the Ten Commandments in any form were publicly displayed in any state or federal courthouse, much less that the practice of displaying them was widespread at the time the Bill of Rights was proposed and adopted. However it may be applied in any other context and

38

circumstances, we do not believe that <u>Marsh</u> saves the Ten Commandments monument in this case from the proscriptions of the Establishment Clause.

E.

The result we reach in this case is not inconsistent with our recent decision in <u>King</u>, No. 02-14146, slip op. 2541. In that case, we applied the <u>Lemon</u> test and concluded that the Seal of the Richmond County Superior Court did not violate the Establishment Clause despite its inclusion of a depiction of the Ten Commandments. <u>Id.</u> at 2556. The Seal included an image of two tablets, the first with Roman numerals I through V and the second with numerals VI through X. <u>Id.</u> at 2543. The Seal had been in use for more than one hundred thirty years, and there was no evidence about why the pictograph of the Commandments was originally included. The county proffered a plausible secular purpose, which was that the Commandments allowed illiterate Georgians to recognize the Seal as a symbol of law, and in the absence of any showing that the proffered secular purpose was implausible, we concluded that the County had satisfied the purpose prong of the <u>Lemon</u> test. <u>Id.</u> at 2546-48.

On the effect prong, we noted in <u>King</u> that the constitutionality of a government's use of a predominantly religious symbol depends on the context in which it appears, <u>id.</u> at 2548-52, and we concluded that given the context in which

39

the pictograph of the Ten Commandments appeared on the Seal, a reasonable observer would not believe that the Seal was an endorsement of religion. Id. at 2552-56. Alongside the tablets on the Seal was a sword, which is a symbol of the legal system, and we reasoned that the depiction of the Ten Commandments on that Seal must be taken in context. "Like the secular decorations surrounding the crèche in Lynch or the other lawgivers who accompany Moses and the Ten Commandments on the south wall frieze of the Supreme Court building, the Seal's sword and the words 'SUPERIOR COURT RICHMOND COUNTY, GA' contextualize the Ten Commandants pictograph." Id. at 2554 (footnote omitted).

In King, we also gave weight to the small size of the tablets: "[T]he pictograph of the tablets and sword is at most only one inch in diameter and is not the focal point of any governmental display in an important public building." Id. at 2555. Finally we noted that the tablets did not include the text of the Ten Commandments, and that a reasonable observer would therefore be less likely to focus on the religious aspects of the Commandments. Id. at 2555-56.

The distinctions between that case and this one are clear. In King, there was no evidence of a non-secular purpose; in this case, there is an abundance of evidence, including parts of the Chief Justice's own testimony, that his purpose in installing the monument was not secular. In King, the image was in the context of

40

another symbol of law; in this case the monument sits prominently and alone in the rotunda of the Judicial Building. In <u>King</u>, the image was approximately one-inch in size and not a focal point; in this case the monument is an unavoidable two-and-one-half ton centerpiece of the rotunda. Finally, there was no text of the Commandments on the Seal in <u>King</u>; in this case the monument contains text from the King James version of the Bible.[3]

Nor is our decision today inconsistent with those from any other circuits in recent years involving the Ten Commandments. The Third Circuit issued an

---

[3]"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." <u>Larson v. Valente</u>, 456 U.S. 228, 244, 102 S. Ct. 1673, 1683 (1982). Several amici in this case have pointed out that Chief Justice Moore chose the excerpts of the Ten Commandments from the King James Version of the Bible, which is a Protestant version. Jewish, Catholic, Lutheran, and Eastern Orthodox faiths use different parts of their holy texts as the authoritative Ten Commandments. "In some cases the differences among them might seem trivial or semantic, but lurking behind the disparate accounts are deep theological disputes." Steven Lubet, <u>The Ten Commandments in Alabama</u>, 15 Const. Comment. 471, 474-76 & n. 18 (1998); <u>cf.</u> <u>Lemon</u>, 403 U.S. at 628-29, 91 S. Ct. at 2119 (noting the conflict between Catholics and Protestants over the use of the King James Version of the Bible in nineteenth century public schools).

To give but one example, the Hebrew translation of the Sixth Commandment prohibits only murder, not all killings as the King James Version does (and in the Lutheran and Catholic versions it is the Fifth Commandment, not the Sixth). <u>See</u> Brief of Amicus Curiae The American Jewish Congress at 15 (citing Gerald Blidstein, <u>Capital Punishment: The Classic Jewish Discussion</u>, in 14 <u>Judaism</u> 159 (1965)); Brief of Amicus Curiae Ala. Clergy, <u>et al</u>. at 14; Brief of Amicus Curiae Am.-Arab Anti-Discrimination Comm. at 13 n.4; <u>see also</u> <u>Harvey v. Cobb County</u>, 811 F. Supp. 669, 677 (N.D. Ga. 1993) ("As Rabbi Lewis testified, this ['Thou shalt not kill'] version of the Sixth Commandment is a mistranslation of the original Hebrew, which prohibits murder, and frequently appears in Christian versions of the Ten Commandments."), <u>aff'd mem.</u>, 15 F.3d 1097 (11th Cir. 1994). The point is that choosing which version of the Ten Commandments to display can have religious endorsement implications under the Establishment Clause.

opinion just days before this one holding that the inaction of county commissioners with respect to a plaque that had been on the outside wall of a historically significant courthouse for more than eighty years did not violate the Establishment Clause. Freethought Soc'y v. Chester County, ___ F.3d ____, No. 02-1765 (3d Cir. June 26, 2003). That case is readily distinguishable from this one because the plaque had been there more than eight decades and no government entity or official has done anything in modern times to highlight or celebrate its existence, or even to maintain it; the plaque is not located in a prominent place but instead is away from the main entrance of the courthouse near a permanently closed door where visitors have no reason to go; and the text of the plaque is not visible to passersby on the sidewalk, who can see only the title "The Commandments." Id. man. op. at 5-7, 11-12, 31-33; id. at 39 (Bright, J., concurring).

As the Third Circuit noted in the Freethought Society case, "a new display of the Ten Commandments is much more likely to be perceived as an endorsement of religion" by the government than one in which there is a legitimate "preservationist perspective." Id. at 31, 32; see also id. at 33 ("[I]t is highly significant that there is no evidence that the County has taken any action involving the plaque since it was erected 80 years ago."); id. at 39 (Bright, J., concurring) (noting the "crucial facts" that the location of the plaque was not changed when the

42

old entrance near it was closed, leaving the plaque barely visible from the street and its text mostly obscured, and concluding that "[a] world of difference exists between the conduct of the Chester County officials approving the placement of the plaque at the then main entrance to the Chester County Courthouse eighty-three years ago and the decision of Chester County not to remove the plaque as of today").

This case on its facts is closer to those in which the Sixth and Seventh Circuits have held prominent displays of the Ten Commandments on government grounds to violate the Establishment Clause.  See Adland v. Russ, 307 F.3d 471 (6th Cir. 2002) (returning a large, granite Ten Commandments monument from storage to a prominent position on the capitol grounds would violate the Establishment Clause), cert. denied, 123 S. Ct. 1909 (2003); Ind. Civil Liberties Union v. O'Bannon, 259 F.3d 766 (7th Cir. 2001) (erecting a seven-foot tall, 11,500-pound limestone monument, one side of which contained the Ten Commandments, on statehouse grounds would violate the Establishment Clause) cert. denied, 534 U.S. 1162 (2002); Books v. City of Elkhart, 235 F.3d 292 (7th Cir. 2000) (displaying a Ten Commandments monument, identical to the one involved in Adland, on the lawn of the municipal building violated the Establishment Clause), cert. denied, 532 U.S. 1058 (2001).

F.

The difference in results between the <u>King</u> and <u>Freethought Society</u> decisions on the one hand, and the <u>Adland</u>, <u>Books</u>, and <u>O'Bannon</u> decisions on the other hand, illustrates that factual specifics and context are nearly everything when it comes to applying the Establishment Clause to religious symbols and displays.[4] Our decision is necessarily limited to the case before us. It implies nothing about different cases involving other facts. We do not say, for example, that all recognitions of God by government are per se impermissible. Several Supreme Court Justices have said that some acknowledgments of religion such as the

---

[4]Chief Justice Moore contends that under the district court's reasoning, the sculpture of "Themis," the Greek goddess of justice, which is part of the fountain in front of the courthouse where the trial in this case took place, would also be unconstitutional. Brief of Appellant at 15 n.4. His contention ignores the clear factual and contextual distinctions between that sculpture and the Ten Commandments monument. There is no evidence that the sculpture has had the effect of furthering religion, or that its purpose was to do so.

declaration of Thanksgiving as a government holiday, our national motto "In God We Trust," its presence on our money, and the practice of opening court sessions with "God save the United States and this honorable Court" are not endorsements of religion. See, e.g., Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 322-23, 120 S. Ct. 2266, 2286 (2000) (Rehnquist, C.J., dissenting, joined by Scalia and Thomas, JJ.) (the Establishment Clause does not prohibit singing the National Anthem with its concluding verse "And this be our motto: 'In God is our trust'"); Lynch, 465 U.S. at 693, 104 S. Ct. at 1369-70 (O'Connor, J., concurring) ("Those government acknowledgments of religion [declaration of Thanksgiving as a holiday, the national motto on money, and the opening of court sessions with reference to God] serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs."); id. at 717, 104 S. Ct. at 1382 (Brennan, J., dissenting, joined by Marshall, Blackmun, and Stevens, JJ.) (such acknowledgments are immune from Establishment Clause challenges "because they have lost through rote repetition any significant religious content"). In its Allegheny County decision, the Supreme

45

Court did not imply that such acknowledgments of God in the Pledge of Allegiance and the National motto violate the Establishment Clause, "because there is an obvious distinction between crèche displays and references to God in the motto and the pledge." Allegheny County, 492 U.S. at 603, 109 S. Ct. at 3106. For the same reason, our decision in this case does not imply that, either.[5]

## VI.

Finally, we turn to a position of Chief Justice Moore's that aims beyond First Amendment law to target a core principle of the rule of law in this country. He contends that the district court's order and injunction in this case contravene the right and authority he claims under his oath of office to follow the state and federal constitutions "as he best understands them, not as understood by others." Brief of Appellant at 51. He asserts that "courts are bound by the Constitution, not by another court's interpretation of that instrument," and insists that he, as Chief Justice is "not a ministerial officer; nor is he answerable to a higher judicial

---

[5]While we are on the subject of what the decision in this case does not mean, we reject Chief Justice Moore's argument that this decision means that the Establishment Clause requires "the purging of all 'religious' sources from any opinions that the Chief Justice might write such as the one in Yates v. El Bethel Primitive Baptist Church, [No. 1001913, (Ala. Oct. 11, 2002) (Moore, C.J., dissenting)]." Brief of Appellant at 28. It means no such thing.

authority in the performance of his duties as administrative head of the state judicial system."[6]  Brief of Appellant at 53.

The Chief Justice's brief reminds us that he is "the highest officer of one of the three branches of government in the State of Alabama," and claims that because of his important position, "Chief Justice Moore possesses discretionary power to determine whether a court order commanding him to exercise of [sic] his duties as administrative head is consistent with his oath of office to support the federal and state constitution." Brief of Appellant at 54.  Article VI, clause 3, of the United States Constitution states:  "The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution . . . ."  Article XVI, section 279 of the Alabama Constitution requires state officials to take a similar oath or affirmation to support the federal and state constitutions.  Chief Justice

_____

[6]A critical distinction is worth mentioning here.  While all state and federal courts are bound to follow decisions of the United States Supreme Court, state courts when acting judicially, which they do when deciding cases brought before them by litigants, are not bound to agree with or apply the decisions of federal district courts and courts of appeal. See Arizonans for Official English v. Arizona, 520 U.S. 43, 58 n.11, 117 S. Ct. 1055, 1064 n.11 (1997); Powell v. Powell, 80 F.3d 464, 467 (11th Cir. 1996). That is different from what we have here.  At issue here is not a judicial decision of the Alabama Supreme Court, eight-ninths of which had nothing to do with the challenged action.  At issue here is the conduct of a party, who concedes he acted not judicially but as the administrative head of a state government department, and in that capacity his conduct is subject to as much scrutiny as that of any head of any government department.

Moore's argument takes his obligation and turns it into a license. To say the least, there is nothing in law or logic to support his theory.

The clear implication of Chief Justice Moore's argument is that no government official who heads one of the three branches of any state or of the federal government, and takes an oath of office to defend the Constitution, as all of them do, is subject to the order of any court, at least not of any federal court below the Supreme Court. In the regime he champions, each high government official can decide whether the Constitution requires or permits a federal court order and can act accordingly. That, of course, is the same position taken by those southern governors who attempted to defy federal court orders during an earlier era. <u>See generally, e.g.</u>, <u>Meredith v. Fair</u>, 328 F.2d 586, 589-90 (5th Cir. 1962) (en banc) (enjoining Mississippi Governor Ross Barnett from interfering with the district court's order to admit a black student to the University of Mississippi); <u>Williams v. Wallace</u>, 240 F. Supp. 100, 110 (M.D. Ala. 1965) (Johnson, J.) (enjoining Alabama Governor George C. Wallace from interfering with and failing to provide police protection for plaintiffs' march from Selma to Montgomery); <u>cf.</u> <u>United States v. Barnett</u>, 376 U.S. 681, 84 S. Ct. 984 (1964) (holding that the Governor of Mississippi was not entitled to a jury trial on a charge of criminal contempt for willfully disobeying a temporary restraining order of a federal district court).

Any notion of high government officials being above the law did not save those governors from having to obey federal court orders, and it will not save this chief justice from having to comply with the court order in this case. See U.S. Const. Art. III, § 1; id. Art. VI, cl. 2. What a different federal district court judge wrote forty years ago, in connection with the threat of another high state official to defy a federal court order, remains true today:

> In the final analysis, the concept of law and order, the very essence of a republican form of government, embraces the notion that when the judicial process of a state or federal court, acting within the sphere of its competence, has been exhausted and has resulted in a final judgment, all persons affected thereby are obliged to obey it.

United States v. Wallace, 218 F. Supp. 290, 292 (N.D. Ala. 1963) (enjoining Governor George C. Wallace from interfering with the court-ordered desegregation of the University of Alabama); accord, e.g., Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401 (1958); Sterling v. Constantin, 287 U.S. 378, 397-98, 53 S. Ct. 190, 195 (1932) (stating that if a state Governor could nullify a federal court order "that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases").

The rule of law does require that every person obey judicial orders when all available means of appealing them have been exhausted. The chief justice of a

state supreme court, of all people, should be expected to abide by that principle. We do expect that if he is unable to have the district court's order overturned through the usual appellate processes, when the time comes Chief Justice Moore will obey that order. If necessary, the court order will be enforced. The rule of law will prevail.

## VII.

AFFIRMED.

EDMONDSON, Chief Judge, concurs in the result.