MIDDLEBROOKS, District Judge,
dissenting:
I.
Justice Oliver Wendell Holmes wrote that he was not “troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law.” Irwin v. Gavit, 268 U.S. 161, 167, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925). Our Establishment Clause jurisprudence is “of necessity one of line-drawing, of determining at what point a dissenter’s rights of religious freedom are infringed by the State.” Lee v. Weisman, 505 U.S. 577, 598, 112 S.Ct. 2649, 2661, 120 L.Ed.2d 467 (1992). While I agree with much of the majority opinion, particularly with respect to the danger of the federal judiciary embarking on the editing of prayer, I disagree that Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) should be read so broadly as to authorize prayer at virtually every government meeting. Marsh has been viewed as an exception to the rule, justified only by a specific history. In this case, the majority allows the exception to swallow the rule. I respectfully dissent.
II.
Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) governs modern Establishment Clause jurisprudence, subjecting both laws and government practices to a three-part test to determine whether they are constitutional. *1283 See McCreary County, Ky. v. ACLU of Ky., 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005); Glassroth v. Moore, 335 F.3d 1282 (11th Cir.2003). For a law or practice to be deemed constitutional, “[fjirst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster ‘an excessive government entanglement with religion.’ ” Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111 (internal citations omitted).
The prayer solicited and sponsored by the Cobb County commissions violates all three prongs of the Lemon test. It would be incredulous to argue any purpose other than a religious one for “invoking divine guidance” upon the commissions, and the parties do not allege any other purpose. It is equally axiomatic that the primary effect of the prayers is to advance religion. See Marsh, 463 U.S. at 797, 103 S.Ct. at 3339. The practice of praying at the commissions’ sessions also constitutes excessive entanglement between the State and religion. Cobb County staff are charged with inviting local religious leaders to deliver the prayers, and as the District Court and the majority have affirmed, such a practice has been conducted in a discriminatory, unconstitutional way.
In concluding the Lemon opinion, Chief Justice Burger wrote for the majority: “[t]he Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn.” Lemon, 403 U.S. at 625, 91 S.Ct. at 2117. Twelve years later, Chief Justice Burger found some involvement and entanglement justified. In Marsh, a Nebraska legislator challenged the Nebraska Legislature’s practice of beginning each of its sessions with a prayer offered by a chaplain chosen and employed by the state. Rather than apply the Lemon test to the practice, the Supreme Court instead looked to the history of Congressional prayer. Based on the discrete, historical fact that the same Congress that authorized the Bill of Rights also authorized legislative prayer before Congress, the Court found the practice constitutional.[1] As Chief Justice Burger wrote for the majority:
On Sept. 25, 1789, three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights. Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress. It has also been followed consistently in most of the states, including Nebraska, where the institution of opening legislative sessions with prayer was adopted even before the State attained statehood.
Marsh, 463 U.S. at 788-90, 103 S.Ct. at 3334-35 (internal citations omitted). Explaining that historical patterns, standing alone, “cannot justify contemporary violations of constitutional guarantees,” the Marsh Court reasoned that historical evidence “sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice *1284 authorized by the First Congress — their actions reveal their intent.” Id. at 790, 103 S.Ct. at 3335. Thus, Marsh did not evolve from the Supreme Court’s modern history of Establishment Clause jurisprudence, but instead, arose out of a “unique” historical fact.[2] See Marsh, 463 U.S. at 790, 103 S.Ct. at 3335.
The Supreme Court has never expanded the Marsh exception. Rather, the Supreme Court consistently has applied the Lemon test in subsequent Establishment Clause cases, including a case in which various religious leaders were invited to give invocations at public school graduations. In Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), petitioners challenged Providence, Rhode Island’s practice of inviting members of the clergy to give “nonsectarian” invocations and benedictions at the public schools’ graduation ceremonies. Applying the Lemon test — and distinguishing Marsh as a narrow decision limited to its unique history — the District Court and the Court of Appeals both ruled the practice was unconstitutional. See 505 U.S. at 584-85, 112 S.Ct. at 2653. The Supreme Court affirmed, declining the Government’s invitation to extend the Marsh exception. Rejecting the argument that state-sponsored prayer comports with the Establishment Clause so long as it is “nonsectarian” and thus advances some sort of “civic religion,” the Court explained that the Founders’ separation of government from religion was intended to protect the integrity of both. Writing for the majority, Justice Kennedy reminded us:
The First Amendment’s Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission. It must not be forgotten then, that while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, the same Clauses exist to protect religion from government interference.
Id. at 589, 112 S.Ct. at 2656.
In a concurring opinion, Justice Black-mun observed that “[sjince 1971, the Court has decided 31 Establishment Clause cases.” Observing that whether participation in state-sponsored religious exercises was voluntary or coerced was immaterial to the constitutional analysis, Justice Blackmun added:
We have believed that religious freedom cannot exist in the absence of a free democratic government, and that such a government cannot endure when there is fusion between religion and the political regime. We have believed that religious freedom cannot thrive in the absence of a vibrant religious community and that such a community cannot prosper when it is bound to the secular. And we have believed that these were the animating principles behind the adoption of the Establishment Clause. To that end, our cases have prohibited government endorsement of religion, its sponsorship, and active involvement in *1285 religion, whether or not citizens were coerced to conform.
Id. at 608, 112 S.Ct. at 2667.
Justice Blackmun warned, “[w]hen the government arrogates to itself a role in religious affairs, it abandons its obligation as guarantor of democracy.”
In the more than 15 years since the Lee decision, neither the Supreme Court nor this Court has expanded the Marsh exception to include other government prayers. See, e.g. Bunting v. Mellen, 541 U.S. 1019, 124 S.Ct. 1750, 158 L.Ed.2d 636 (2004) (denying cert. from the Fourth Circuit Court of Appeals, which determined that an invocation of God during Virginia Military Institute’s Supper Roll Call ceremony is unconstitutional); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (holding that, despite the District’s long-established tradition of sanctioning student-led prayer at varsity football games, the policy of favoring a student led “invocation” at football games violates the Establishment Clause); Jager v. Douglas County Sch. Dist., 862 F.2d 824 (11th Cir.1989) (declining to use Marsh and holding that the Lemon test was the appropriate test in assessing the constitutionality of invocations delivered prior to public high school games because the practice had an essentially religious purpose, and had the primary effect of advancing religion, and therefore violated the Establishment Clause).
Recently, in Glassroth, the Chief Justice of Alabama installed a Ten Commandments monument in the central rotunda of the Alabama State Judicial Building. Finding no “unambiguous and unbroken history” of displaying religious symbols in judicial buildings, we declined to extend the Marsh exception to allow the monument. We also found that broadening the Marsh exception to other practices would be inconsistent with Establishment Clause jurisprudence, observing:
The Supreme Court has warned that a broad reading of Marsh would gut the core of the Establishment Clause and has stated that “Marsh plainly does not stand for the sweeping proposition ... that all accepted practices 200 years old and their equivalents are constitutional today.”
Glassroth, 335 F.3d at 1297 (internal citations and quotations omitted). With vivid and evocative imagery, Judge Carnes, writing for the Court, rejected the Chief Justice’s argument that, consistent with the Establishment Clause, the Government “may promote religion so long as it does not command or prohibit conduct.” Id. at 1294. As Judge Carnes wrote:
[I]f we adopted [the Chief Justice’s] position ... Every government building could be topped with a cross, or a menorah, or a statue of Buddha, depending upon the views of the officials with authority over the premises. A creche could occupy the place of honor in the lobby or rotunda of every municipal, county, state, and federal building. Proselytizing religious messages could be played over the public address system in every government building at the whim of the official in charge of the premises.
Id. at 1294.
On this matter of first impression, the majority has expanded the Marsh exception to allow prayer at the Cobb County Planning Commission and the Cobb County Commission. This expansion will allow a chorus of government prayers to resound from every “deliberative body” of every locality whose duty it is to address the secular affairs of its constituents. If the Establishment Clause prohibits a religious monument from occupying the lobby of a County building, it defies logic to conclude that the Clause nevertheless sanctions *1286 state-sponsored prayer at public meetings upstairs.
The majority cites to the plurality opinion, Van Orden v. Perry, 545 U.S. 677, 125 S.Ct. 2854, 2865, 162 L.Ed.2d 607 (2005), in which the Supreme Court deviated somewhat from Lemon in allowing a monument with the Ten Commandments to remain on the Texas state capitol grounds. But see Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (applying Lemon in allowing the display of a nativity scene). Although Chief Justice Rehnquist, joined by Justice Scalia, Justice Kennedy, and Justice Thomas, wrote that the Lemon test is “not useful in dealing with the sort of passive monument,” he still relied, in part, on the purpose prong of the Lemon test. In delivering his opinion, Justice Rehnquist affirmed that there was a “valid secular purpose” to the monument: “recognizing and commending the [monument’s sponsors] for their efforts to reduce juvenile delinquency.” Van Orden, 545 U.S. at 686, 682, 125 S.Ct. 2854, 2856, 2858, 162 L.Ed.2d 607. In addition, concurring in the judgment, Justice Bryer suggested that an evaluation under Lemon might lead to the same result. 545 U.S. at 700, 125 S.Ct. 2854, 2869, 162 L.Ed.2d 607.
Thus, the Supreme Court’s ad hoc approach to the display of religious symbols “has come to ‘requirfe] scrutiny more commonly associated with interior decorators than with the judiciary.’ ” Lee, 505 U.S. at 636, 112 S.Ct. 2649, 2681, 120 L.Ed.2d 467 (Scalia, J. dissenting). This approach might do for the quiescent display of religious monuments and holiday decorations, however; a more rigorous and consistently applied evaluation is required, and has been applied, when the state assumes the active exercise of public prayer.
III.
I would draw the line at state-sponsored prayer at invocations before the United States Congress and the state legislatures. Marsh is an outlier in Establishment Clause jurisprudence. Therefore, the utmost restraint should be used in expanding its holding to sanction more state-sponsored prayers. As this Court has stated, “[i]n refusing to declare Nebraska’s legislative invocation unconstitutional, the Court relied on the ‘unique history’ associated with the practice of opening legislative sessions with a prayer.” Jager, 862 F.2d at 828.[3]
The two Cobb County commissions do not have the “unambiguous and unbroken history of more than 220 years” of prayer central to the holding in Marsh, nor do they have a “practice of over a century” of invocation prayers as did the Nebraska legislature. Prayers offered at the two Cobb County commissions are not so ancient a practice:[4] the Cobb County Board of Commissioners was founded in 1964,[5] and the Cobb County Planning Commission was founded in 1956.[6] Prayers at the meetings of the commissions hardly can be considered part of the fabric of this nation’s history.
*1287 County commissions, such as that of Cobb County, also differ fundamentally from state legislative bodies.[7] Under Georgia law, the Cobb County Commission is at best quasi-legislative. It performs executive as well as legislative functions, most notably the administration of certain rules and regulations as applied to an individual, entity, or group. While the Georgia Constitution provides for separation of powers between the three branches of government: legislative, judicial and executive, see Ga. Const, art. 1, § 11 (2008), the doctrine of separation of powers applies only to the state and not to municipalities or to county governments. See Bldg. Auth. of Fulton County v. Georgia, 253 Ga. 242, 321 S.E.2d 97 (1984).[8] County commissions’ powers are strictly limited by law, and if there is reasonable doubt as to the existence of a particular power, the doubt is resolved in the negative. See Mobley v. Polk County, 242 Ga. 798, 251 S.E.2d 538 (1979).[9]
A review of recent minutes from County Commission meetings shows that the Commission performs the executive (administrative) and adjudicative functions expected of municipal government. For example, on January 8, 2008, the Cobb County Board of Commissioners recognized the Murdock Elementary School for being named as a 2008 Georgia School of Excellence by the Georgia Department of Education. In that same meeting, the Board: approved construction contracts; accepted a $1,125.00 donation from Wal-Mart; decided to “suspend for seven (7) days, the Cobb County liquor, beer and wine pouring licenses for Pappa’s Restaurant, Inc”; and approved “the appointment of Mr. Michael Petelle to the Keep Cobb Beautiful Board.” The County Commission also dealt with county personnel decisions, approving “the reclassification of an existing Maintenance Worker II position, grade 40, to an Administrative Specialist I position, grade 41, and further authorize [sic] the conversion of an existing part-time Administrative Aide position to a part-time Maintenance Tech position.”
I acknowledge that there is dicta within Marsh that can be used to support the majority’s expansive view of Legislative Prayer, including a reference to “other deliberative bodies.” Marsh, 463 U.S. at 786, 103 S.Ct. at 3333. But that is not the holding of the case, and it is untethered from Marsh’s historical justification. Marsh should be viewed as an exception, not as establishing a principle of law that can be extended beyond its reach.[10] If *1288 Marsh is read broadly, separation of church and state as it now exists becomes relegated only to the schools.[11]
Describing it as producing an absurd result, the majority credits me with reasoning which is actually the opposite of my view. I do not argue that government prayer by the Boston City Council should be tolerated because it was established in 1822. After all, the Massachusetts Constitution at that time, largely written by John and Samuel Adams, established a state religion financed by tax payers, authorized mandatory church attendance and the imposition of criminal sanctions for blasphemy, and discriminated against Catholics. Steven Waldman, Founding Faith 110-111 (New York, Random House, 2008); Leonard W. Levy The Law of the Commonwealth and Chief Justice Shaw 39, 52-53 (New York, Oxford University Press, 1957). Most would agree that such practices are unconstitutional today. Marsh’s parameters are not based upon vintage alone, but also do not establish a principle susceptible to general application. In my view, prayer is authorized in the Alaska state legislature but not in the Boston City Council. I concede this is an imperfect result, but, consistent with Marsh, it maintains separation of church and state.
If we apply the legislative prayer exception beyond the Congress or state legislatures considered in Marsh, not only does the historical justification disappear, but the entanglement with religion becomes more problematic. As the Supreme Court noted in Lee, “[o]ne timeless lesson is that if citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people.” 505 U.S. at 592,112 S.Ct. at 2658.
In Lee, Justice Kennedy pointed out that the atmosphere at the opening of a session of a state legislature allows people to enter and leave with little comment and for a number of reasons. Id. at 596, 112 S.Ct. at 2660. Contrast that with a county commission acting in a quasi-adjudicative role, deciding whether to terminate an employee, suspend a liquor license, or grant a zoning variance. A citizen seeking relief has little choice but to attend, and has no role in the choice of prayer. It is fundamentally illogical for our Establishment Clause jurisprudence to forbid cadets from hearing grace before a meal at VMI, yet require members of the public who attend zoning meetings in Cobb County, Georgia, to hear a prayer asking for guidance— from a deity which may not be their own— on the decision over a parking lot variance.[12]
Yet what is the purpose of the state-sponsored prayer? The commissioners’ “fínger-through-the-Yellow-Pages” selection procedure belies the notion that the commissioners are seeking guidance from their deity, since it is possible, indeed likely, that no member will share the faith of the person offering the prayers.
*1289 Is it then to show a general approval of religion? If so, the Supreme Court has repeatedly condemned governmental preference for religion over non-religion. See Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 17, 28, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989); Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (“The First Amendment mandates governmental neutrality between ... religion and nonre-ligion”).
The Establishment Clause also does not authorize the promotion of religion, so long as a “diversity” of religious views are represented. As Justice Souter, joined by Justice Stevens and Justice O’Connor presciently warned in Lee, “that position would necessarily compel the government and, inevitably the courts, to make wholly inappropriate judgments about the number of religions the State should sponsor and the relative frequency with which it should sponsor each.” Lee, 505 U.S. at 617, 112 S.Ct. at 2671. The majority comes close to suggesting this justification by giving great emphasis to the “diversity” of the prayer givers, some of whom came from “the Jewish, Unitarian, and Muslim faiths.”
Is this state-sponsored prayer even really prayer? Is it the prayer that we would expect to hear in a church, synagogue or mosque? Or is it watered-down, politically correct prayer? Do references to a deity become largely “laconic,” as Judge Story described the majority of references to Christ occurring in the Cobb County Commissions? See Pelphrey v. Cobb County, Ga., 410 F.Supp.2d 1324, 1327 (N.D.Ga.2006) (“the more elaborate or repetitive Christian references were unusual, and were contained in only a minority of the prayers”).
I concur with the majority that judges, as representatives of the government, have no business editing or evaluating the content of prayer. However, I also believe that sponsorship of prayer by these commissions presents a similar, although less direct, danger. When state sponsored prayer is a perfunctory and sterile exercise marking the beginning of a commission agenda, religion becomes the casualty.
The unique historical fact that was the keystone of Marsh’s, holding was that the very men who voted to include the Bill of Rights in the Constitution, three days later voted for the appointment of a chaplain to lead Congress in prayer. The Court wrote that the “historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress — -their actions reveal them intent.” Marsh, 463 U.S. at 790, 103 S.Ct. at 3335. Based on the principle that “[a]n act passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument” ... “is contemporaneous and weighty evidence of its true meaning,” the Marsh court determined that congressional prayer is constitutional. Id. (internal citations omitted). It extended that determination to the Nebraska state legislature, an unquestionably legislative body, one that had a “practice of over a century” of prayer. Id.
Justice Brennan’s dissent in Marsh, along with other historical scholarship, chronicles the divisions among the drafters of the Establishment Clause over the First Congress’ appointment of the chaplain, including James Madison’s strident disapproval. The Marsh majority, however, simply looked to the historical chronology to infer the intent of the drafters, and that interpretation is compelling. There is no such compelling history in this case. To divine the intent of the drafters of the Establishment Clause as applied to the Cobb County Commissions or other local *1290 government meetings requires too many inferences upon inferences to justify such a radical departure from Lemon and its progeny. Historians may speculate on how James Madison and his contemporaries would regard prayer before the Cobb County Planning Commission and the Cobb County Commission, but I do not find such an evaluation useful.
IV.
As there was at the drafting of the Establishment Clause, there are those today who desire the State use its power to buttress their own faiths.[13] And, as there was in the eighteenth century, today there are government officials who would oblige them, who would use their positions, and even the municipal buildings that house them, to deliver religious messages 'and prayers while carrying out the secular duties of their offices. See Glassroth v. Moore, 335 F.3d 1282 (11th Cir.2003). But the doctrine of “separation and neutrality” leaves no place “for the machinery of the State to affirm their beliefs.” Lee, 505 U.S. at 629, 112 S.Ct. at 2677.[14] The “separation” does not simply drive expressions of faith to the periphery of public life, but instead provides a bulwark for Americans’ faith from the dulling and often corrupting influence of government.[15] At the same time, the “neutrality” of government in a pluralistic society provides equal opportunity and freedom for those of different faiths and different denominations to flourish and practice their beliefs. See Marsh, 463 U.S. at 803, 103 S.Ct. at 3342. As Justice Brennan explained in his dissent in Marsh, the Establishment Clause:
prevents] the trivialization and degradation of religion by too close an attachment to the organs of government. The Establishment Clause stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy to permit its unhallowed perversion by a civil magistrate.
Id. (internal citations and quotations omitted).
Adoption of the Establishment Clause was a break from ecclesiastic rule,[16] and *1291 the commencement of the separate spheres of religion and government so as to preserve the integrity of both. The hazards that result from ecclesiastic rule, both for religion and for government, were perceived by the drafters. Those hazards can be observed today in places where the distinctions between religious and secular laws are blurred, where dissent is not tolerated, and where faith becomes a weapon to be wielded by those who seek power. In this country, pious politicians who compete for support through public professions of their own rectitude and devotion take a step toward those hazards, and religion becomes less meaningful through the hollow prayers spoken with the dual purpose of seeking a divine audience and appealing to a secular one.
V.
As Chief Justice Burger wrote, “[t]he Constitution decrees that religion must be a private matter ... and while some involvement and entanglement are inevitable, lines must be drawn.” Lemon, 403 U.S. at 625, 91 S.Ct. at 2117. I would draw the line at state-sponsored prayer at invocations before the United States Congress and State legislatures. I therefore dissent.

. Michael W. McConnell also has commented on the singular reasoning behind the Marsh decision, stating: "The interesting thing about the opinion is that it is based squarely and exclusively on the historical fact that the framers of the first amendment did not believe legislative chaplains to violate the establishment clause.” Michael W. McConnell, On Reading the Constitution, 73 Cornell L. Rev. 359, 362 (1988).

. Justice Brennan wrote for the majority in Edwards v. Aguillard, "[t]he Lemon test has been applied in all cases since its adoption in 1971, except in Marsh v. Chambers, where the Court held that the Nebraska Legislature’s practice of opening a session with a prayer by a chaplain paid by the State did not violate the Establishment Clause. The Court based its conclusion in that case on the historical acceptance of the practice.” Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987) (citations omitted).

.In enumerating the constitutional practices that intermingle religion with state activity, Chief Justice Rehnquist did not include prayers in local government meetings, identifying only the Congress and state legislatures. See Lynch v. Donnelly, 465 U.S. 668, 670, 104 S.Ct. 1355, 1357 (1984) ("To forbid the use of this one passive symbol while hymns and carols are sung and played in public places including schools, and while Congress and state legislatures open public sessions with prayers, would be an overreaction contrary to our history and our holdings.”)

. The transcripts in evidence cover the period from January 1995 to May 2006. [Red Br. 4],

. 1964 Ga.L.2075.

. 1956 Ga.L.2006, amended by 1964 Ga.L. 814, 1974 Ga.L. 3872.

. In determining the particular functions of a governmental body or official, we must refer to the state law definitions of that entity’s functions. See Turquitt v. Jefferson County, 137 F.3d 1285, 1287 (11th Cir.1998) (en banc); Marsh v. Butler County, 225 F.3d 1243 (11th Cir.2000).

. This Court has sharply divided over whether Georgia county commissioners are entitled to the same Eleventh Amendment immunity that is enjoyed by the state legislature. See Manders v. Lee, 338 F.3d 1304 (11th Cir.2003) (Anderson, J., dissenting, joined by Wilson, J.).

. In determining the particular functions of a governmental body or official, we refer to the state law definitions of that entity's functions. See Turquitt v. Jefferson County, 137 F.3d 1285, 1287 (11th Cir.1998) (en banc); Marsh v. Butler County, 225 F.3d 1243 (11th Cir.2000).

.For example, do "deliberative bodies” include the courts in this circuit? On August 15, 2008, the Associated Press reported that an Alabama judge, who once wore a judicial robe embroidered with the Ten Commandments, ordered a group appearing before him to hold hands and pray. See also N.C. Civil Liberties Union Legal Found. v. Constangy, 947 F.2d 1145 (4th Cir.1991) (rejecting a judge's argument that opening court with prayer fell within the Marsh legislative exemption as a “deliberative body,” and holding the practice unconstitutional under the Lemon test).

. The Sixth Circuit has refused to permit state-sponsored prayer at meetings of school boards despite arguments based upon Marsh. See Coles ex rel. Coles v. Cleveland Bd. of Educ., .171 F.3d 369, 380 (6th Cir.1999) ("Marsh does not support the proposition that government-sponsored prayer at all 'deliberative public bodies' is presumptively valid.”).

. The Cobb County Planning Commission is even further removed from Marsh. It is not a legislative body because it has no rule making or decision making authority. The only action the Planning Commission can take is to recommend zoning and land use regulations. See Section 134-65, Cobb County Code. Section 134-65 names some "additional powers” of the Planning Commission, namely that "[i]t may recommend ... programs for public improvements and financing thereof.”

. See also County of Allegheny v. ACLU of Greater Pittsburgh, 492 U.S. 573, 611, 109 S.Ct. at 3110, 106 L.Ed.2d 472 (1989) ("To be sure, in a pluralistic society there may be some would-be theocrats, who wish that their religion were an established creed, and some of them perhaps may be even audacious enough to claim that the lack of established religion discriminates against their preferences. But this claim gets no relief, for it contradicts the fundamental premise of the Establishment Clause itself, the antidiscrimi-nation principle inherent in the Establishment Clause necessarily means that would-be discriminators on the basis or religion cannot prevail.”) (Kennedy, J., concurring in part, dissenting in part).

. In a letter to the Danbury Baptist Association, in 1802, Thomas Jefferson wrote: "Believing with you that religion is matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and state.” Letter from Thomas Jefferson to the Danbury Baptist Ass’n (Jan. 1, 1801) in 8 Writing of Thomas Jefferson 113 (H. Washington ed., 1861). But see Wallace v. Jaffree, 472 U.S. 38, 92, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (calling the wall of separation a “misleading metaphor”).

. "[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation.” Lee, 505 U.S. at 590, 112 S.Ct. at 2657 (quoting Memorial and Remonstrance Against Religious Assessments (1785), in 8 Papers of James Madison 301 (W. Rachal, R., et al. eds., 1973)).

. "[A]s late as the time of the Revolutionary war, there were established churches in at least eight of the thirteen former colonies and *1291 established religions in at least four of the other five.” Engel v. Vitale, 370 U.S. 421, 428, 82 S.Ct. 1261, 1265, 8 L.Ed.2d 601 (1962).